Richard CARMACK, d/b/a Carmack Elk, et al., Respondent/Appellant,

v.

John SAUNDERS, Director, Missouri Department of Agriculture, Appellant/Respondent.

Richard CARMACK, d/b/a Carmack Elk, et al., Appellant,

v.

John SAUNDERS, Director, Missouri Department of Agriculture, Respondent.

Nos. WD 48625, WD 48631.

Missouri Court of Appeals, Western District.

Oct. 4, 1994.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cristie A. Kincannon, Asst. Atty. Gen., Jefferson City, for appellant.

Gwendolyn Sue Froeschner, Columbia, for respondent.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

HANNA, Judge.

This appeal arises out of a writ of mandamus issued by the Circuit Court of Cole County, Missouri. At issue is the State Veterinarian's and the Missouri Department of Agriculture's (Department) application of certain provisions of the Missouri Livestock Disease Control and Eradication Law.

The relator, Richard Carmack, is part owner and operator of Carmack Elk Farm located just south of Glasgow, Missouri. The original elk purchased to start the operation were brought in from Canada in 1990 and 1991. At that time, they were tested and certified to be disease free.

In November 1991, Mr. Carmack and Dr. John Hennessy, then the State Veterinarian of Missouri, heard a report that the Canadian herd from which Mr. Carmack had purchased his animals was afflicted with tuberculosis. The Department indicated that it wanted the entire herd tested for bovine tuberculosis.

On December 9, 1991, Mr. Carmack's herd, then consisting of fifty-two elk, was tested for tuberculosis using the Single Cervical Test (SCT). The SCT is a procedure in which microbacteria bovis is injected into the skin of the animal's neck. The injection site is observed seventy-two hours later for inflammation and swelling. Eleven of Mr. Carmack's elk tested positive, and Dr. Hennessy restricted movement of the entire herd until further testing could be done.

On July 21, 1992, Dr. Hennessy quarantined the herd and issued Special Conditions of Quarantine, which contained the state's plan for further testing and various courses of action for eradication of the disease. Dr. Hennessy planned to administer the Comparative Cervical Test (CCT) on the eleven who had reacted to the initial test.

The CCT is a procedure in which the skin on the animal's neck is injected with two separate forms of the bacteria, approximately three inches apart. On the top is an injection of microbacteria avian, which is the bird form of tuberculosis, and on the bottom is microbacteria bovis, the mammalian type of tuberculosis. The two injection sites are observed and compared seventy-two hours after injection for inflammation and swelling. At the time the tests were performed on Mr. Carmack's elk, neither the state nor the federal government had any guidelines or standards for the tuberculosis testing of elk. Therefore, Dr. Hennessy testified that he came up with his own standard after consultation with several veterinarians. The Special Conditions of Quarantine stated, in part:

> Animals having a response of 2.0 mm or more and which is equal to or greater than the avian response, shall be classified as positive to the test.

However, Dr. Hennessy testified that the standard set out in the Special Conditions was incorrectly written. The standard he intended and actually used on the herd is that an animal is considered positive if the site of the bovine injection is raised two millimeters or more above the site of the avian injection. According to the guidelines used by Dr. Hennessy, six animals tested positive for bovine tuberculosis. Had he used the guidelines set out in the Special Conditions, ten of the eleven animals tested would have had positive results.

The CCT, although more accurate than the SCT, is not conclusive. The only way to know for sure whether an elk has tuberculosis is by killing the animal and conducting a post-mortem examination. Dr. Hennessy, therefore, decided that it was necessary to sacrifice and necropsy the six animals.

Mr. Carmack and the Department then began the process of determining the proper indemnification from the state for the six elk. The parties agreed that § 267.610, RSMo 1986, was the appropriate statute to use to determine indemnification. The statute requires that an appraisal be done on all animals which the state veterinarian decides need to be slaughtered. § 267.610.1, RSMo 1986. The appraisals are made jointly by the owner of the animal and a representative of the director of agriculture. § 267.610.2, RSMo 1986. In the case of disagreement, a disinterested third party is called in to determine the proper appraisal. *Id.* The animals are to be appraised at their "actual value," giving consideration to breeding value as well as to dairy and meat value. § 267.610.4, RSMo 1986.

The Department established the actual value of Mr. Carmack's elk based on a three-tiered appraisal system, with separate values for animals who are nondiseased, exposed to disease and infected with the disease. Mr. Carmack, on the other hand, used the market value of the animals without taking the disease factor into account. Since the parties disagreed, Dr. Knight was called in to appraise the animals. He valued each elk at $7,650.58, and placed a value on calves in utero.

Disagreement continued until Mr. Carmack filed his petition for writ of mandamus. In his petition, Mr. Carmack asked the court

to order the State Veterinarian to destroy the ten animals which tested positive according to the criteria set forth in the Special Conditions of Quarantine, and sought compensation in the amount recommended by the independent appraiser. Additionally, he asked that the same compensation scheme be applied to any future decisions to slaughter with respect to his entire herd which was quarantined. After the filing, the parties entered into an agreement which provided for indemnification in the amount of $7,650.58 for each of the six elk that Dr. Hennessy had determined needed to be slaughtered. Any issues with respect to these six elk were dismissed from the action.

In the interim, the legislature amended § 267.610 to change the method for determining indemnification. Instead of the appraisal method, indemnity is now to be an amount fixed by the director of the Department, within the limits of appropriation. § 267.610.1, RSMo Supp.1993. The statute states, "The provisions of this section shall apply to all cases to which the provisions of this section would otherwise apply which are settled after January 1, 1993." § 267.610.2, RSMo Supp.1993.

On September 9, 1993, the trial court entered its order in favor of Mr. Carmack. The provisions of the order relevant to this appeal include: (1) the Department must apply the terms of § 267.610 in existence on the date of the quarantine of the Carmack herd; (2) the Department must discontinue use of the three-tiered valuation system for indemnification under that section; and (3) the Department must pay Mr. Carmack attorney fees in the amount of $4,710. The court further held, "There is no evidentiary basis for overturning the decision of the State Veterinarian as to which of the animals were to be destroyed since the decision is by statute specifically reserved to his judgment." Both parties appeal.

In Mr. Carmack's sole point on appeal, he argues that the court erred in refusing to order the destruction of all the animals which tested positive for tuberculosis according to the test set out in the Special Conditions. He claims that the four animals in question "should have been destroyed and compensat-

ed because the decision as to which animals were to be destroyed was not specifically reserved to the State Veterinarian by statute in that the State Veterinarian had already established his criteria and made it binding on [Mr. Carmack]."

■ Mr. Carmack admits that § 267.610 gives the State Veterinarian the discretion to determine which, if any, animals need to be slaughtered. However, he argues that the State Veterinarian exercised that discretion when he formulated and issued the Special Conditions which contained the criteria for testing the elk. Once those guidelines had been established, the only thing left for the State Veterinarian to do was the ministerial task of administering the test and interpreting the results according to the Special Conditions.

■ The statute is clear that the legislature did not intend to limit the discretion of the State Veterinarian. The State Veterinarian has the expertise to determine when an animal is diseased and should be slaughtered, and should make his decision based on all the knowledge he has acquired at that time. The Special Conditions were merely guidelines, and were appropriately subject to change by the State Veterinarian when, in his judgment, a more reliable method for making the decision became available.

■ In this case, the State Veterinarian performed the CCT as described in the Special Conditions. However, his interpretation of the results differed. To explain the apparent discrepancy, he testified that he interpreted the results, in consultation with several other veterinarians, using a scattergram. A scattergram is basically a graph with the avian response on one axis and the bovine response on the other. By plotting the points and comparing the relative responses of the animals, it is easier to tell which elk fall within the range considered to be diseased. His use of the scattergram and deviation from the criteria described in the Special Conditions were discretionary acts specifically reserved to his judgment by § 267.-610. Point denied.

The bulk of the Department's appeal challenges the trial court's decision regarding the appropriate compensation rate for any animals in Mr. Carmack's herd already under quarantine which may have to be slaughtered in the future. The Department's first two points address the court's finding that the application of the new provisions of § 267.610 operated to impair a vested substantive right of Mr. Carmack and, therefore, amounted to *ex post facto* law retrospective in its operation as to Mr. Carmack. In the first point, the Department argues that the finding amounts to an advisory opinion, which is not permitted by Missouri law. In the second point, the Department argues that the changes to the statute were procedural in nature and did not impair Mr. Carmack's substantive right to indemnification. In its third point, the Department contests the court's finding that there is no statutory support for the Department's use of a three-tiered valuation system of indemnification, arguing that such a finding is contrary to the intent of § 267.610. The Department's first three points can be resolved by an examination of general principles regarding the availability of a writ of mandamus. A court can provide no remedy "that is more drastic, no exercise of raw judicial power that is more awesome, than that available through the extraordinary writ of mandamus." *State ex rel. Kelley v. Mitchell,* 595 S.W.2d 261, 266 (Mo. banc 1980). As a result, courts should issue the writ sparingly, and only to compel performance of a clearly established, presently existing right. *State ex rel. Brentwood Sch. Dist. v. State Tax Comm'n,* 589 S.W.2d 613, 614 (Mo. banc 1979).

To be entitled to a writ of mandamus, the relator must have a clear, unequivocal, specific right to have an act performed. *Farnsworth v. Wee,* 743 S.W.2d 115, 117 (Mo. App.1988). The respondent must have a corresponding present, imperative, unconditional duty to perform the action sought. *Id.* The function of a writ of mandamus "is to enforce, not establish, a claim or right and its purpose is to execute, not adjudicate." *Id.* Therefore, to the extent that legal or factual issues must be adjudicated, mandamus is not an appropriate mechanism. *Kelley,* 595 S.W.2d at 268.

At the time the trial court made its decision, the six elk who tested positive according to the State Veterinarian had already been slaughtered. Further, Mr. Carmack had already received indemnification for those six. Mr. Carmack does not have a present, unconditional, specific right to be indemnified for any future slaughters under the unamended version of § 267.610, or to have indemnification calculated without the three-tiered system used by the Department. Rather, Mr. Carmack is attempting, through the writ, to establish his right to future relief. He is not entitled to use the writ process to adjudicate. *St. Louis Police Officers' Ass'n v. Sayad,* 685 S.W.2d 913, 916–17 (Mo.App. 1984).

If and when the State Veterinarian ultimately decides that additional animals need to be slaughtered, the parties may raise the issue of whether Mr. Carmack should be indemnified under the old or the new provisions of § 267.610, and can address the propriety of the three-tiered system of calculating indemnification used by the Department under the old version of § 267.610. The trial court erred in rendering a decision based on Mr. Carmack's beliefs that the State Veterinarian may decide in the future that more elk need to be slaughtered, and that the Department may choose to indemnify him under the new provisions of § 267.610. The trial court's decision is reversed insofar as it ordered the Department and the State Veterinarian: (1) to apply the indemnification provisions of § 267.610 that were in existence at the time of the quarantine; and (2) to discontinue the use of a three-tiered valuation system under that section.

In the Department's final point on appeal, it argues that the trial court erred in granting Mr. Carmack attorney fees "because, under the facts of this case, Missouri law requires either a statutory or equitable basis for such an award and neither exist in this case." Mr. Carmack responds that he had a statutory basis to recover attorneys' fees pursuant to § 529.060, RSMo 1986. Section 529.060 states, in relevant part:

In case a verdict shall be found for the person suing out such writ, ... he shall

recover his damages and costs, in such manner as he might do in a civil action for a false return. . . .

It is not enough that Mr. Carmack prevailed on some or most of his claims. Such damages may not be recovered unless and until the respondents, here the Department and the State Veterinarian, make a false return. *See State ex rel. Dahl v. Lange,* 661 S.W.2d 7, 8 (Mo. banc 1983); *Smith v. Berryman,* 272 Mo. 365, 199 S.W. 165, 167 (Banc 1917). There has been no showing of a false return, and nowhere in the pleadings did Mr. Carmack allege a false return. Therefore, Mr. Carmack was not entitled to attorney fees under § 529.060. The trial court's judgment awarding Mr. Carmack attorney fees in the amount of $4,710 is reversed.

All Concur.